Argued February 26; modified March 24; rehearing denied May 19; second petition for rehearing denied June 9, 1936

# CARPENTER v. CARPENTER
(56 P. (2d) 305, 57 P. (2d) 1098, 58 P. (2d) 507)

586

*R. R. Rankin,* of Portland (Wood, Montague, Matthiessen & Rankin, of Portland, on the brief), for appellant Dewey L. Carpenter.

*James G. Wilson,* of Portland (Wilson & Reilly, of Portland, on the brief), for respondent May H. Carpenter.

BEAN, J. There is a preliminary question to be disposed of, although submitted in the reply brief. Defendant Dewey L. Carpenter moved the court to dismiss the appeal of May H. Carpenter, cross-appellant, on the grounds that cross-appellant has enforced her rights under the judgment and decree, and it would be inconsistent for her now to challenge the same, and that this court has no jurisdiction to hear an appeal from a judgment that has been so consented to and confirmed. Prior to the consideration of this motion, however, we have read all the testimony and are firmly of the opinion that equity does not demand a change of the decree in favor of the plaintiff.

On June 8, 1935, the decree was signed by the trial judge. On June 14, 1935, cross-appellant instructed the county clerk to issue an execution and on the same date execution was issued commanding the sheriff to levy upon and sell the 106¾ shares of Sheppard Point Packing Company stock and all of the appellant's right, title and interest in and to the real property in Port-

land, Oregon. The sheriff levied the execution on June 18, 1935. The return of the sheriff made August 18, 1935, shows that after due notice the sheriff served notice of garnishment on the United States National Bank of Portland, and that he sold all of defendant's interest in the real and personal property described in the decree, to wit: Stock of the Sheppard Point Packing Company at $15,031.25; claim against the receiver for $500; defendant D. L. Carpenter's interest in the real property for $519.75, total $16,051. On August 2, $16,000 of the proceeds was turned over to the attorney for cross-appellant and on August 14 plaintiff's attorney moved the court for an order based thereon confirming the above sale. Plaintiff and cross-appellant has exercised all her rights under the judgment that would take from D. L. Carpenter the property that the court has awarded him. She also claims a balance on the judgment.

 The enforcement of the judgment and decree indicates that the plaintiff was satisfied therewith and is entirely inconsistent with an appeal therefrom. She having affirmed the decree in the manner shown by the judgment roll can not now appeal from it: *Moore v. Floyd*, 4 Or. 260; *Portland Construction Co. v. O'Neil*, 24 Or. 54 (32 P. 764); *Oregon Electric Ry. Co. v. Terwilliger Land Co.*, 51 Or. 107 (93 P. 334, 930); *Elwert v. Marley*, 53 Or. 591 (99 P. 887, 101 P. 671, 133 Am. St. Rep. 850); *State v. Wells-Fargo & Co.*, 64 Or. 421 (126 P. 611, 130 P. 983); *Kellogg v. Smith*, 70 Or. 449 (142 P. 330). By enforcing a judgment or decree by execution or otherwise a party clearly waives his right to appeal unless the decree is such or the circumstances such that there is no inconsistency between such enforcement and the appeal: 3 C. J. 685, § 569.

Plaintiff contends that it was necessary to take the appeal in order to protect the rights of plaintiff and prevent sale or encumbrance of the property decreed to defendant and defeat the collection of her judgment. We fail to see how this was necessary, as all the property and assets were impounded in the United States National Bank of Portland, awaiting an adjudication of the matter.

The cross-appeal of plaintiff May H. Carpenter should be dismissed.

We will endeavor to make a kind of picture or description of the money transactions involved which pertain to several corporations which are brought in question in the present case. We have read some thousand pages of testimony, examined a large number of exhibits and are firmly of the opinion that to make an exact accounting of the transactions between the parties during all their married life, until their separation, is simply an impossibility. As we understand, the trial court made an estimate. It will be our endeavor to make an equitable estimate of the matters involved. We will make this statement as a description and not as a finding or decision.

Plaintiff and defendant intermarried in the city of Portland, Oregon, on June 14, 1911, and are now husband and wife. Defendant graduated from a college in the East and came west to make his fortune, and found that his best opportunities were in the forestry work, and while so occupied he became engaged, in September, 1910, to May H. Henderson, daughter of M. F. and Sarah Henderson. At that time and up to his death on October 5, 1926, M. F. Henderson was a wealthy man. His estate was appraised in the sum of

$956,096.68, and he provided for the widow, Sarah Henderson, and the children. Mrs. Henderson still survives. Upon the mother's death the children are made the sole beneficiaries.

Defendant had no property other than his salary from the forestry service, and he talked over frankly with M. F. Henderson his reluctance to become married and his then inability to support his fiancee in the manner in which she should be supported. Afterwards M. F. Henderson and defendant were very intimate friends, partly from the relation of son-in-law that was later assumed upon the defendant's marriage.

Mr. Henderson was generous, patriotic, energetic and provided for all the members of his family and was intimately associated with Dewey L. Carpenter, the defendant. He suggested that defendant resign from the forestry service, which he did, and for about two years Dewey L. Carpenter, with the assistance and advice of Mr. Henderson, canvassed various kinds of industries for the purpose of finding some business suitable for defendant and in which defendant could become interested. Mr. Henderson furnished Carpenter $500 for expenses before the marriage. It was desired that this business should have large potential possibilities for making money and could be built up by industrious management. The first business entered into was the Brownsville Cannery, which turned out unfortunately and practically nothing was done with it because of the default of one of the employees who embezzled a large portion of the $5,000 of capital furnished by Mr. Henderson, a man in whom Mr. Henderson had confidence.

The next venture is that of the Canoe Pass Packing Company. In 1912, M. F. Henderson caused to be or-

ganized the Canoe Pass Packing Company and furnished the money for the capital thereof. In the organization of this company he caused 150 shares of stock to be placed in the name of Dewey L. Carpenter and 150 shares to be placed in his own name. In addition to these 300 shares, 100 additional shares were issued, 50 to each of two individuals under an agreement to purchase the same. The Canoe Pass enterprise did not prosper during the first three and one-half years of its existence, by reason of which Mr. James A. Davidson, one of the outside parties, transferred back his stock, consisting of 50 shares, to M. F. Henderson, and in September, 1915, Henderson took back into his own name all of the shares of capital stock, so that on January 1, 1916, Henderson had in his own name the entire 400 shares, as shown by the stock book of the Canoe Pass Packing Company. These shares were estimated to be of the value of $40,000. Thereupon Mr. Henderson proceeded to reorganize the company. Henderson acquired 72 shares of additional stock listed at a valuation of $8,040. He thereupon charged off $15,000, reduced the capital stock to $70 a share and reduced his investment therein to $33,040.

Mr. Henderson, in his private books, directed an entry charging himself with a gift, at $33,040, crediting the capital stock of the Canoe Pass Packing Company with the value of this stock, at $33,040, with the following notation:

> "118 shares given to Milton B. Henderson
> 118 shares given to Bonnie Henderson
> 118 shares given to May H. Carpenter
> 118 shares given to Lee
>
> 472 shares @ 70."

The stock certificates for this stock were issued to Milton B. Henderson, son of M. F. Henderson, to Bonnie Henderson, a daughter, to D. L. Carpenter, defendant, to P. W. Lee, 118 shares each.

After the issuance of this stock, Mr. Henderson loaned additional sums of money to the Canoe Pass Packing Company from time to time, aggregating $42,040. On this account M. F. Henderson received a certificate for 500 shares of capital stock of the Canoe Pass Packing Company, represented by certificate No. 14, endorsed the same and surrendered the certificate, and there was issued therefor certificate No. 16, 166 shares, to Bonnie Henderson; certificate No. 17, 167 shares, to Milton B. Henderson; certificate No. 18, 167 shares, to Dewey L. Carpenter.

It appears that M. F. Henderson used the names of May H. Carpenter and Dewey L. Carpenter interchangeably. Milton B. Henderson testified regarding his father:

"A. He told me he was going to get out of the Canoe Pass Packing Company and divide up his interests in the company between us children."

May H. Carpenter testified:

"A. He said he was dividing some more of the Canoe Pass Packing Company's shares amongst his three children, and I was receiving my shares."

Subsequent to 1924 all the property of the Canoe Pass Packing Company, together with that of the Alaska Sea Food Company, was transferred to the Sheppard Point Packing Company, and in exchange therefor 748 shares of the capital stock of the Sheppard Point Packing Company was issued to the Canoe Pass Packing Company, one share to Milton B. Henderson, and one share to D. L. Carpenter. On June 30, 1927,

said stock was endorsed to the Sheppard Point Packing Company and in lieu thereof there was issued to defendant D. L. Carpenter a certificate of stock for 213½ shares.

The trial court found that in causing said 213½ shares of stock to be placed in the name of defendant, M. F. Henderson intended to give them in equal proportions to plaintiff and defendant. We concur in this finding.

In January, 1924, Mr. Henderson cashed some bonds and gave $30,000 to the children, $10,000 to each, for the purpose of putting it in the treasury of the Canoe Pass Packing Company, to enable it to reduce its indebtedness at the bank. Plaintiff's Exhibit No. 14 is a check in Mr. Henderson's own handwriting, signed by him, payable to May H. Carpenter, for $10,000. This check was endorsed by defendant, signed "May H. Carpenter" and his own name, deposited in the joint bank account and immediately paid to the Canoe Pass Packing Company for the liquidation of the bank loans. The account of defendant Dewey L. Carpenter, with the Canoe Pass Packing Company, January 1, 1915, to December 31, 1917, as compiled from the books, shows that defendant was credited with salaries totaling $35,500 on December 31, 1924. However, on December 31, 1924, there is a cancellation of salary of $18,420.89, leaving credit for salaries, $17,079.11; by interest, total, $3,261.29; by dividends May 27, 1927, and June 9, 1927, $7,944.37; profit on sale of Liberty Loan bonds, January 8, 1920, $138.60; old account, $476.50, total credit, $28,899.93. The debits approximate that amount.

Dewey L. Carpenter's account with the Beaver Portland Cement Company to November 30, 1925, shows credit salary $30,000, to which is added expense ac-

counts and notes for borrowed money advanced for the company, with interest, making a total credit of $94,180.04. His debits are:

| | |
|---|---:|
| Cash payment | $16,675.82 |
| Sundry items | 2,504.22 |
| Prior preferred stock | 75,000.00 |
| | $94,180.04 |

Mrs. Carpenter claimed a gift to her from her father of $5,000, given to her husband in trust for her. The evidence shows that this was a sum that her father gave to one Gordon to put into the Brownsville Cannery and that it never came into defendant's hands. Gordon absconded with a large part of these funds.

Plaintiff claimed a gift to her from her father of $9,500, that it was delivered by her father to defendant for her use. This is comprised of two sums of money, $6,000 and $3,500, which plaintiff claimed was put into the Farm Magazine Company which published the Western Farmer. The record indicates that these two sums were loaned to the company. Subsequently stock certificates for 60 shares and 35 shares were issued to M. F. Henderson as an investment in the company for the money he so put in.

Mrs. Carpenter also claims $2,000 which was invested in a Packard car. We think this was a family matter and should be eliminated from the case.

■ We are firmly convinced, from a careful reading of the testimony in the case and a consideration thereof, and of all the circumstances, that it was the plan of M. F. Henderson to establish his son-in-law in business for the benefit of the family of D. L. Carpenter and May H. Carpenter. This is indicated by the advance he made to Carpenter before the marriage, the $5,000

that he advanced to Gordon to start a business at Brownsville, and many other arrangements, among which is the transaction with P. W. Lee for his stock in the Canoe Pass Packing Company, for which he paid $250, and afterwards turned over his salary in payment of $8,040. At that time Mr. Henderson's connection with the Canoe Pass Packing Company and the Sheppard Point Packing Company had been closed on the books and Mr. Henderson directed that the $8,040 be credited to D. L. Carpenter. He seemed to be just as well satisfied to have it credited to Carpenter as to himself. Mr. Henderson was very liberal and assisted in the different undertakings and desired all of them to be successful, including the farm magazine.

■ D. L. Carpenter transacted the business for himself and for Mrs. Carpenter. She testified that he transacted her business largely, and there appears to be no complaint, either in regard to what was done or the manner in which the business was conducted in all of these corporate undertakings, until domestic difficulties arose.

Mrs. Carpenter testified:
"A. * * * Once I purchased stock.
Q. What has become of those cash gifts,—$44,000?
A. Well, that I put into the Beaver Portland Cement Company, * * * In 1920."

She states it was never repaid to her. If Mrs. Carpenter invested her money in the Beaver Portland Cement Company or the Ross Island Sand & Gravel Company and her husband assisted and endeavored to carry out the project to a successful termination, we fail to see why he should recompense her for the money invested, if the investment was unprofitable. Mrs. Carpenter seems satisfied to take the stock of the

Canoe Pass Packing Company and the Sheppard Point Packing Company, and the trial court has awarded her one-half thereof. As to the Beaver Portland Cement Company, it appears that for a time that bid fair to be successful, but as the depression crept on and building slowed up, there was less sale for cement and sand, and gravel, and the returns were not as satisfactory for the Beaver Portland Cement Company and the Ross Island Sand and Gravel Company as could be desired.

Bonnie Henderson married W. H. Muirhead, who, as we understand, handled her business much the same as Mr. Carpenter handled Mrs. Carpenter's affairs.

Mrs. Carpenter testified as follows:

"Q. Do you recall the occasion of the purchase by your husband and Mr. Muirhead of some stock in the Beaver Portland Cement Company?

A. Yes, I remember.

Q. With whom did you first, as you now recall, discuss that investment?

A. Well, I discussed it with my father.

\* \* \* \* \*

Q. What was the tenor of that discussion? What, in substance, did Mr. Henderson say to you?

A. Well, he had looked into the business and thought it might be all right to invest in it, and so I— although I did not care much about investing in it—

Q. You said you didn't care about it?

A. Well, I did not want to invest in another business, to tell you the truth.

\* \* \* \* \*

Q. To make the investment, what was necessary?

A. Well, there was quite a bit of money involved in it. I— it was going to take about everything we could scrape together.

Q. Did the making of this investment require the sale of any bonds?

A. Yes. It was going to take all the bonds I had at that time.

\* \* \* \* \*

Q. Then after the initial purchase of this stock, were there later calls for money in connection with that company?

A. Yes, they had to have more money. They did not have enough to run on after they made the first purchase.

Q. And was there any discussion about the advisability of putting up more money?

A. Well, we talked it over with my father, and he thought it would be necessary for more money to go in, and so he said he would give my sister and myself more money, so we could put in into the business.

\* \* \* \* \*

Q. Do you recall how much your father gave you that was put into this business?

A. Well, it was over $40,000.00, I think—44 thousand and some odd.

\* \* \* \* \*

Q. Was there a later call, or necessity for money in connection with some of the investments for that Ross Island Sand & Gravel Company made by your husband?

A. Well, my husband bought quite a lot of stock in the Ross Island Sand & Gravel Company and could not pay for it entirely, so he owed quite a bit on it and made payments every year and interest twice a year, and it became necessary to use more money at that time.

Q. And what, if any, discussion did you have with him on that subject?

A. Well, at the time that the debt was incurred he and Mr. Muirhead expected to pay this out of salary, which they did not draw, and it was coming to them, and the profits of the business, but they did not seem to be able to do this. The company could not pay them their back salaries and it was necessary to get the money from some other source.

Q. Did your husband discuss that with you?

A. Yes, I knew about it.

Q. Did you have any discussion with anyone about the advisability of allowing any more of your money to go into that venture?

A. Well, I did, at a later date—not at that time—

Q. What was this later date, roughly?

A. Well, it was about—1930 or maybe 1929.

Q. Will you tell us what that was?

A. Well, my sister and mother and my brother and myself were talking it over—we knew about the dividends—

Q. (Interrupting) What dividends?

A. The dividends from the Sheppard Point Packing Company. There was one to be paid and my sister and I did not like to have it go into this business, and my brother seemed to think it was a mistake to put it in too. The business was not in very good shape. It looked like sending good money after bad—but, we did put it in, because there was no other money available."

Therefore it seems that the matter of investment in the Beaver Portland Cement Company and the Ross Island Sand & Gravel Company was thoroughly discussed by Mrs. Carpenter with the members of the Henderson family, and Mrs. Carpenter, although somewhat reluctant, entered into the enterprise with her eyes wide open. None of us knew at that time what was going to happen in regard to the depression or how extensive it would be.

The $44,000 mentioned by Mrs. Carpenter in her testimony is a part of the judgment she obtained against the defendant, which consisted of the following items:

"$15,600.00 Par value Liberty Bonds of value equal to par used by defendant in January, 1920 in the purchase of the Beaver Portland Cement Company stock.

44,480.00 Gift from M. F. Henderson to plaintiff and used by defendant in operating the Beaver Portland Cement Company during 1920 for which, with interest, Beaver Portland Cement Company gave its note, which was later converted into preferred stock of the Beaver Portland Cement Company taken in in the name of the defendant.

1,200.00 Loaned to defendant.

800.00 Two items of $400 each, direct loan to defendant.

350.00 Additional loan to defendant to pay insurance premiums.

62,430.00 Total."

In lieu of a portion of this judgment, plaintiff Mrs. Carpenter should be awarded a decree of the capital stock of the Beaver Portland Cement Company and the Ross Island Sand & Gravel Company, standing in the name of D. L. Carpenter, being $75,000 par value of such stock in those two corporations.

The testimony shows that Mrs. Carpenter loaned defendant $1,200; she also made two loans of $400 each, and a further sum of $350, for which she is entitled to a judgment in the amount of $2,350.

■■ The plaintiff claims that all of the property was a gift from her father to herself during his lifetime. Defendant submits that the burden of proof is on the one claiming to be the donee of the property to establish facts essential to the validity of such a gift: 28 C. J. 670, § 71; 12 R. C. L. 971, § 44. The evidence to prove a

gift must be clear and convincing and every essential element of a gift must be proved: 28 C. J. 676-679, §§ 82 and 83; 12 R. C. L. 973, § 45.

■ Defendant submits that the books and declarations of M. F. Henderson in regard to the transactions involved, as applying the rule *In re Estate of Fisher,* 128 Or. 415 (274 P. 1098), and kindred cases, are not competent evidence under section 9-403, Oregon Code 1930, which provides in part:

"that when a party to an action, suit, or proceeding by or against an executor or administrator appears as a witness in his own behalf, or offers evidence of statements made by a deceased against the interest of the deceased, statements of the deceased concerning the same subject-matter in his own favor may also be proven."

This action is not by or against an executor or administrator of M. F. Henderson and we do not think this section applies.

■ Declarations made by a person, since deceased, against his pecuniary or proprietary interest concerning facts within his knowledge, which are material and relevant to the issue, are sometimes admissible in evidence, although not a part of the res gestae, and although the declarant was not a party nor in privity with a party to the action: *Mentzer v. Burlingame,* 85 Kans. 641 (118 P. 698); 1 Nichols, Applied Evidence, 379; *Mace v. Timberman,* 120 Or. 144 (251 P. 763); 22 C. J. 232, § 209; § 9-207, Oregon Code 1930. In 1 Elliott on Evidence, § 436, the rule is stated thus:

"Declarations made by persons who possessed peculiar means of knowing the matter stated, and had no interest to misrepresent it, are admissible in evidence when pertinent and relevant, whether made orally or in writing, provided, first, that the declarant is dead,

and secondly, that such declarations were opposed to the declarant's pecuniary or proprietary interest. They embrace entries in books, and all other written or oral declarations of facts made under the above conditions."

We feel compelled to consider the acts and declarations of M. F. Henderson as far as they go, and it has been our endeavor to decide the matter as Mr. Henderson would have arranged it, had it been left to him prior to the time that domestic difficulties arose.

■ In Thornton on Gifts and Advancements, 198, § 224, it is said in part:

"Declarations made by the donor after the time of the alleged gift in favor of the donee or tending to admit that a donation was made of the subject-matter of the gift to the donee are admissible on behalf of the donee and those claiming under him, to establish the fact of the gift; * * *"

When the Canoe Pass Packing Company was incorporated March 20, 1912, it was organized with four shareholders, namely, Robb and Davidson, who were to pay for their 50 shares each, M. F. Henderson and D. L. Carpenter dividing the other 300 shares equally between them, making a total of 350 shares. None of the descendants of M. F. Henderson at this time received any interest in this company of any kind or character. D. L. Carpenter gave no note or any other indication of indebtedness for the stock. Evidently it was the intent of Mr. Henderson that Carpenter would build up the business, if possible, and have an interest therein. Carpenter was a director and secretary-treasurer for the company and attended to the office business in Portland and to the sale of the products of the packing company, and other matters.

■ We do not indulge in any presumption that Mrs. Carpenter made a present of her property to her hus-

band. See Thornton on Gifts and Advancements, 210, § 242.

■ Lot 10, Block 10, Westover Terraces, was conveyed to D. L. Carpenter and May H. Carpenter, husband and wife. The difference between the price of this property and the proceeds of the residence that was sold was paid for from the joint bank account of Mr. and Mrs. Carpenter, which had been contributed to largely by Mrs. Carpenter. The real property was owned by plaintiff and defendant as an estate by the entirety. The fact that Mrs. Carpenter voluntarily contributed more funds in the payment for the property than did her husband is immaterial: *Smith v. Durkee*, 121 Or. 86, 90 (254 P. 207); 13 R. C. L. 1109, § 130. This real estate should be decreed to belong to plaintiff and defendant as an estate by the entirety.

■ Plaintiff claims defendant took large sums of her money and invested the same. If we considered defendant as agent of his wife, then, while he was authorized to lend or invest the money of his principal, he should exercise reasonable skill and ordinary care and diligence and is liable for losses occasioned by his negligence: 2 C. J. 729, § 392. D. L. Carpenter, as an agent, was not an insurer against losses due to honest mistakes or errors of judgment, and if he acted in good faith and with reasonable skill and ordinary care and diligence, as the testimony indicates that he did, he is not liable for losses which his wife, as the principal, sustained: 1 Perry on Trusts, § 409. Mrs. Carpenter, as principal, is required to assume the loss involved in her agent's bona fide purchase of stock for her account under her directions or with her sanction: *Maus v. Dionne*, 163 La. 322 (111 So. 772).

■ Considering the matter from the standpoint that Carpenter was a trustee for Mrs. Carpenter, then the rule is, "if a competent beneficiary, with full knowledge of the facts, and not led thereto by any improper conduct of the trustee, requests a trustee to make a nonlegal investment, or consents thereto formally or informally, such cestui will not be heard later to complain of damage flowing from the investment", or charge the trustee with loss: 3 Bogert's Trusts and Trustees, 2078, § 689; *In re Perkins Trust Estate,* 314 Pa. 49 (170 Atl. 255).

It seems perfectly clear that Mrs. Carpenter authorized the investment of the $44,480 in stock for the Beaver Portland Cement Company and the Ross Island Sand & Gravel Company, and the $15,600 bonds she authorized to be sold and used in the same business for the purchase of additional stock. The decree of the trial court implies that there had been a wrongful conversion by Mr. Carpenter of these funds, or that they were taken without the plaintiff's consent.

The judgment and decree of the trial court is modified, and it is ordered, adjudged and decreed:

(1) That plaintiff have and recover from the defendant the sum of $2,350;

(2) That plaintiff is the beneficial owner of one-half of the stock of the Sheppard Point Packing Company standing in the name of defendant, and which stock has been impounded by transfer to the United States National Bank of Portland, Oregon, and plaintiff is entitled to have one-half of such stock transferred into her name on the books of the Sheppard Point Packing Company, and this decree is authority for the United States National Bank of Portland, Oregon,

and said bank is hereby directed forthwith, to cause to be transferred and delivered to plaintiff one-half of said Sheppard Point Packing Company stock so deposited with it, to wit: One-half of 213½ shares, or 106¾ shares;

(3) That the remaining one-half interest in the capital stock of the Sheppard Point Packing Company, to wit: One-half of said 213½ shares, or 106¾ shares, now impounded in the possession of the United States National Bank of Portland, Oregon, is declared to be the property of defendant, and defendant is entitled to have said one-half of such stock transferred to his name on the books of the Sheppard Point Packing Company, and this decree is authority for the United States National Bank of Portland, Oregon, and said bank is hereby directed forthwith, to cause to be transferred and delivered to defendant one-half of said stock so deposited with it, to wit: One-half of 213½ shares, or 106¾ shares;

(4) That plaintiff is the beneficial owner of the stock of the Beaver Portland Cement Company and Ross Island Sand & Gravel Company standing in the name of defendant, namely, about 750 shares, and plaintiff is entitled to have said stock transferred to her name on the books of said corporations;

(5) That plaintiff and defendant are declared to be the owners as tenants by the entirety of Lot 10, Block 10, Westover Terraces, which at the present time stands in the name of the United States National Bank of Portland, Oregon, to abide the outcome of this suit, and the United States National Bank of Portland, Oregon, is hereby authorized to convey said Lot 10, Block 10, Westover Terraces, to the plaintiff and defendant as tenants by the entirety;

(6) That execution issue to enforce this decree;

(7) That neither party hereto shall recover costs or disbursements against the other.

CAMPBELL, C. J., and RAND and BAILEY, JJ., concur.

---

Petition for rehearing denied May 19, 1936

ON PETITION FOR REHEARING
(57 P. (2d) 1098)

BEAN, J. Respondent May H. Carpenter has filed a petition for rehearing in which it is strongly urged, as it was in the original briefs, that there was a technical conversion of shares of stock, money and securities of the plaintiff in connection with the business of the several corporations, in which Dewey L. Carpenter carried on the business for himself and his wife. We have given the matter careful consideration in this suit in equity between the wife and her husband, and we are satisfied with the equitable decree which we have directed to be entered.

■ There is a matter of description to be given further attention. It was our intention to declare, as expressed in our former memorandum opinion, and it is hereby declared, that all of the shares of stock standing in the name of Dewey L. Carpenter in the Beaver Portland Cement Company and the Ross Island Sand & Gravel Company should be decreed to belong to May H. Carpenter, the plaintiff. The stock in these corporations was not very clearly described in the record, and the former opinion described it as about 750 shares of stock. With this change of description the petition for rehearing is denied.

608

ON PETITION FOR REHEARING

(58 P. (2d) 507)

BEAN, J. The defendant Dewey L. Carpenter has filed a motion for a modification of the order denying the rehearing; the plaintiff has filed an answer thereto, and defendant has submitted a reply. The motion is in the nature of a petition for rehearing. We have given the matter careful consideration.

Defendant Dewey L. Carpenter asked for a modification of the order which reads as follows:

"* * * it is hereby declared that all of the shares of stock standing in the name of Dewey L. Carpenter in the Beaver Portland Cement Company and the Ross Island Sand & Gravel Company should be decreed to belong to May H. Carpenter, the plaintiff, * * *."

The defendant asks that only the shares of stock be decreed to the plaintiff that were paid for with her money. As heretofore indicated, the business in which plaintiff and defendant were interested as husband and wife, which continued for a long time, was somewhat complicated, as far as any separation of the amounts they invested was concerned. She and her father furnished the most of the funds, and the defendant transacted the business and received a salary, part of the business of which, particularly the Sheppard Point Packing Company, was quite successful and a regular salary was paid or credited to the defendant. Plaintiff and defendant had a joint bank account which the trial court was unable to segregate and determine what amount each deposited. The stock of the Sheppard Point Packing Company was disposed of by the trial court by an estimate, and, as heretofore stated,

it is impossible to figure out the matter exactly. We have endeavored, in connection with what was done by the trial court, to provide for the rendition of a decree which is equitable, as between the man and his wife.

To grant the request of defendant would practically open up the whole case, as no one matter can be determined singly. Perhaps, in the interest of accuracy, a slight addition in description of the shares of stock decreed to belong to plaintiff May H. Carpenter should be made. That part of the decree relating to the shares of stock in the Beaver Portland Cement Company and the Ross Island Sand & Gravel Company, will read as follows: It is hereby declared that all the shares of stock standing in the name of Dewey L. Carpenter in the Beaver Portland Cement Company and the Ross Island Sand & Gravel Company, excepting the interest therein pledged as collateral prior to the institution of the present suit, should be and is hereby declared and decreed to belong to May H. Carpenter, the plaintiff, and plaintiff is entitled to have said shares of stock transferred to her name on the books of said corporations and delivered to her.

The decree otherwise will be in conformity to the opinion heretofore rendered.

The motion and petition for rehearing will be denied.

CAMPBELL, C. J., and RAND and BAILEY, JJ., concur.